UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| JORDAN ESKEW, | § | |
| Plaintiff | § | |
| | § | |
| v. | § | Case No. 1:25-cv-00804-ADA |
| | § | |
| STONE HILTON PLLC, | § | |
| CHRISTOPHER HILTON, AND JUDD | § | |
| STONE, | § | |
| Defendants. | § | |

## PLAINTIFF'S SECOND AMENDED COMPLAINT

TO THE HONORABLE UNITED STATES DISTRICT COURT:

Plaintiff Jordan Eskew files this Second Amended Complaint and would respectfully show the Court as follows:

### Introduction

1. Plaintiff brings this action for unpaid wage compensation and other relief under the Fair Labor Standards Act ("FLSA"), as amended, 29 U.S.C. § 201, *et seq.* Plaintiff seeks damages for unpaid wages, liquidated damages, and mandatory attorney fees and costs.

2. Plaintiff also brings this action for intentional infliction of emotional distress seeking mental anguish and punitive damages.

3. Plaintiff also brings this action for breach of contract, promissory estoppel, and quantum meruit seeking actual damages and reasonable attorney fees and costs.

4. Plaintiff brings this action for sexual harassment under the Texas Labor Code seeking compensatory damages, punitive damages, and reasonable attorney fees and costs.

5.   Plaintiff brings this action for hostile work environment based on race under section 1981 of the Civil Rights Act of 1866, seeking compensatory damages, punitive damages, and reasonable attorney fees and costs. 42 U.S.C. § 1981.

### Jurisdiction

6.   Jurisdiction is conferred on this Court by 28 U.S.C. § 1337 and by 29 U.S.C. § 216(b). Supplemental jurisdiction is conferred by 28 U.S.C. § 1367(a).

### Venue

7.   Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) because Stone Hilton PLLC has offices located in Austin, Texas, and because the events at issue occurred in Austin, Texas.

### Parties

8.   Plaintiff is an individual who resides in Bastrop, Texas.

9.   Defendant Stone Hilton PLLC is a professional limited liability company, formed and existing under the laws of the State of Texas, and at all times material to this complaint, maintained and operated a business in Austin, Texas.

10. Defendant Christopher Hilton is a resident of Austin, Texas, and a managing member of Stone Hilton PLLC.

11. Defendant Judd Stone is a resident of Austin, Texas, and a managing member of Stone Hilton PLLC.

### Facts

12. From late May of 2023 to September of 2023, Plaintiff Jordan Eskew worked for Defendant Stone Hilton PLLC, a law firm, as an executive assistant.

13. Plaintiff is female and Caucasian.

14. According to Stone Hilton PLLC's website, it is an expert in "crisis management" and "labor and employment" law. As of May 29, 2025, its website stated: "Stone Hilton is fully equipped to handle the biggest and most important civil suits. From business torts to labor and employment . . . our lawyers have vast experience litigation bet-the-company cases, both for the State of Texas and in private practice."

15. Plaintiff reported to Defendants Christopher Hilton and Judd Stone, the managing members of the law firm.

16. Defendants Stone Hilton PLLC, Christopher Hilton, and Judd Stone were all Plaintiff's "employer" under the Texas Labor Code.

17. Prior to working for Stone Hilton PLLC, Plaintiff had previously worked with Christopher Hilton and Judd Stone at the Texas Office of the Attorney General (AG's Office). Christopher Hilton was the Chief of the General Litigation Division, and Judd Stone was the Solicitor General.

18. On May 27, 2023, the Texas House of Representatives voted to impeach Texas Attorney General Ken Paxton. Solicitor General Stone and Chief of the General Litigation Division Christopher Hilton started the law firm Stone Hilton PLLC to assist in defending Texas Attorney General Paxton against the impeachment charges. Solicitor General Stone and Chief of the General Litigation Division Christopher Hilton asked Plaintiff if she would join Stone Hilton PLLC to assist in defending Texas Attorney General Paxton against the impeachment charges, and she agreed. Solicitor General Stone, Chief of the General Litigation Division Christopher Hilton, and Plaintiff took a leave of absence from the AG's Office to help defend Texas Attorney General Ken Paxton in his impeachment trial.

19. Other attorneys who served in the AG's Office at the time, Amy Hilton (no relation to Christopher Hilton), Joe Mazzara, Allison Collins, and Kateland (Katie) Jackson, also took a leave

of absence from the AG's Office to join Stone Hilton PLLC for the purpose of assisting in defending Texas Attorney General Paxton against the impeachment charges.

20. On June 16, 2023, while working for Stone Hilton PLLC, Christopher Hilton, Judd Stone, Kateland (Katie) Jackson, and Plaintiff went to the Mort Subite Belgian Beer Bar for lunch. While there, Christopher Hilton and Judd Stone ordered four shots, one for each person at the table, without Plaintiff's consent, and asked Plaintiff to take a shot. After taking one sip, Plaintiff stated, "That is the most disgusting thing I have ever tasted," to which Judd Stone replied, "I highly doubt that is the most disgusting thing that has ever been in your mouth." Plaintiff looked at Christopher Hilton for help, but Christopher Hilton did nothing other than wince and laugh uncomfortably at Stone's comment.

21. While working at Stone Hilton PLLC, Judd Stone later told Plaintiff, at the Stone Hilton PLLC office: "In this firm, there are no rules. You can say whatever slurs you want." This comment was also witnessed by Christopher Hilton, Allison Collins, Amy Hilton, Joe Mazzara, and Kateland (Katie) Jackson.

22. Stone Hilton PLLC, Judd Stone, and Christopher Hilton approved the Stone Hilton PLLC website, which states that the firm has lawyers with "vast experience" in labor and employment law.

23. Stone Hilton PLLC, Judd Stone, and Christopher Hilton are aware of and familiar with the Fair Labor Standards Act; the laws in the Texas Labor Code prohibiting sexual harassment; section 1981 of the Civil Rights Act of 1866, prohibiting employers from creating a hostile work environment based on race; and that it is illegal to commit intentional infliction of emotional distress in Texas, including in the workplace.

24. But Stone Hilton PLLC, Judd Stone, and Christopher Hilton, who advertise that Stone Hilton PLLC has lawyers with "vast experience" in labor and employment law, failed to provide any anti-discrimination or anti-harassment training to employees of Stone Hilton PLLC. Stone Hilton PLLC, Judd Stone, and Christopher Hilton failed to implement any policy, written or oral, at Stone Hilton PLLC prohibiting discrimination or harassment. Likewise, Stone Hilton PLLC, Judd Stone, and Christopher Hilton failed to implement any policy, written or oral, providing a way to report discrimination or harassment.

25. While working for Stone Hilton PLLC, on or around June 20, 2023, although no one had asked her to order lunch, Plaintiff texted everyone at the office to see whether they would like her to bring lunch on her way in. Judd Stone wanted BBQ. While working at Stone Hilton PLLC, Judd Stone had previously made it clear to Plaintiff that if he asked for something, Plaintiff was to make it happen. Plaintiff tried to place an order for BBQ at several restaurants, but none of them were accepting large orders at that time. Eventually, Plaintiff found a BBQ restaurant that would accept a large order at that time. She placed the order and picked it up. When Plaintiff arrived at the office with lunch, Judd Stone and Christopher Hilton were upset that it took so long for the food to arrive. Judd Stone yelled at Plaintiff about how he was going to "punish" her. This was in front of Christopher Hilton, Joe Mazzara, Kateland (Katie) Jackson, Amy Hilton, Allison Collins, and a third party who did contract work for Stone Hilton PLLC named Ben Williams. Upon information and belief, Christopher Hilton and Judd Stone then went to the bank and then to a bar. At 5:15 p.m. that day, Judd Stone texted Plaintiff in a group chat to Plaintiff, Judd Stone, and Christoper Hilton, stating, "Please don't leave the office until we return. (Approx 30 min) FYI, it's been one Eskew since we left. Aka 133 minutes." Plaintiff replied, "I'm still here! Sorry again about lunch. Truly sorry." Once Judd Stone and Christopher Hilton returned, they announced, within earshot of

Plaintiff, to Joe Mazzara, Kateland (Katie) Jackson, Amy Hilton, and Allison Collins, that they were going to "deal with Jordan [Plaintiff]." They summoned Plaintiff to a separate room and began to berate her in a hostile and abusive manner. Once they were finished, Christopher Hilton continued to verbally abuse Plaintiff, asking: "Do you think you can make yourself cry before you walk out? You know, to mess with everyone."

26. Around July 17, 2023, while working at the Stone Hilton PLLC office, Judd Stone called Plaintiff "white trash" because she was wearing turquoise earrings. This comment occurred in front of Christopher Hilton, who did nothing to correct Stone or stop him.

27. While working for Stone Hilton PLLC, around July 28, 2023, at the Stone Hilton PLLC office, Plaintiff sent Judd Stone his reimbursement spreadsheet for him to approve or make changes to before sending to the accountant for Stone Hilton PLLC. In front of Kateland (Katie) Jackson, Amy Hilton, and Allison Collins, Judd Stone began screaming at Plaintiff that there was something missing.

28. Stone Hilton PLLC, Judd Stone, and Christopher Hilton told the employees of Stone Hilton PLLC that they could charge to Stone Hilton PLLC as a tax deductible business expense and seek reimbursement from Stone Hilton PLLC for "anything and everything," including business suits, Botox treatments, and hair salon appointments, because Stone Hilton PLLC was going to seek reimbursement for these expenses from its client, AG Paxton.

29. Stone Hilton PLLC reimbursed employee(s) (not Plaintiff) for Botox treatments and hair salon treatments. Plaintiff did not seek reimbursement from Stone Hilton PLLC for Botox treatments or hair salon treatments.

30. While working for Stone Hilton PLLC, on or about August 2, 2023, at the Stone Hilton PLLC office, Plaintiff was told she needed to pick up a propane tank so Joe Mazzara could grill at

the office the following day. It was about 4:00 p.m., and Plaintiff asked Judd Stone and Christopher Hilton if she could head home, pick up the propane tank on her way home, and bring it to the office the following morning. Judd Stone and Christopher Hilton said yes, that sounded great. The next morning, Plaintiff brought breakfast tacos for everyone and the propane tank. Plaintiff was asked by Mazzara why the propane tank wasn't there the day before, to which Plaintiff replied that she had gotten permission from Judd Stone and Christopher Hilton to bring it in that day. According to Joe Mazzara and Kateland (Katie) Jackson, Judd Stone told them that he was angry at Plaintiff because the propane tank wasn't there the day before (even though the day before, he had given her permission to bring it in the following day). Mazzara told Judd Stone he would talk to Plaintiff about it, and Stone told him, "Fine, as long as you bitch her out."

31. While working for Stone Hilton PLLC, on August 4, 2023, Plaintiff was at the Stone Hilton PLLC office. Judd Stone was hanging over the upstairs railings screaming at the female attorneys, all of which worked on the ground floor with Plaintiff at that time. Plaintiff received a text from Amy Hilton, asking her (referring to Plaintiff's previous position working with Solicitor General Stone at the AG's Office): "Was Judd like this on the 8th floor? Is he serious when he screams or is it a show?"

32. On or around August 2023, Christopher Hilton indicated to Amy Hilton that he saw Judd Stone was a "management problem." But Christopher Hilton took no action to solve the management problem of Judd Stone.

33. While working at Stone Hilton PLLC, also in August 2023, at the Stone Hilton PLLC office, Judd Stone asked Plaintiff to make him an alcoholic drink, a "Manhattan." Plaintiff did not know how to make a "Manhattan," so he gave her instructions. As she made the drink, he told her she needed to fill it higher, to which Plaintiff responded, "I promise you, it's full." Judd Stone then

told Plaintiff: "If anyone else makes a comment about my drinking, they'll be fired." This incident was witnessed by Christopher Hilton, Allison Collins, Amy Hilton, Joe Mazzara, and Kateland (Katie) Jackson, who did nothing to correct Stone or stop him.

34. While working for Stone Hilton PLLC, Plaintiff regularly observed Christopher Hilton and Judd Stone drinking alcohol at the Stone Hilton PLLC office during the workday. On at least two occasions, they asked Plaintiff to go buy liquor and beer as part of her job duties, at least once from Specs and once from a convenience store. On at least two occasions, Judd Stone asked Plaintiff to make him an alcoholic drink at the office as part of her job duties.

35. Defendant Stone Hilton PLLC also refused to pay Plaintiff wages and reimburse her expenses as promised. Specifically, Stone Hilton PLLC promised to pay Plaintiff an annual salary of $180,000, i.e., wages of $15,000 a month, not including any bonus or expense reimbursement (see attached spreadsheet, attached as Exhibit 1 and hereby incorporated by reference, showing Stone Hilton PLLC promised Plaintiff an annual salary of $180,000), but instead paid her wages of $10,000 a month, not including any bonus or expense reimbursement. Defendant Stone Hilton PLLC owes Plaintiff the difference between the monthly wages it promised her and the monthly wages it actually paid her, i.e., $5,000 a month in wages, not including any bonus or expense reimbursement, for four months, or $20,000 in wages. These wages were promised to Plaintiff by Stone Hilton PLLC and remain unpaid.

36. Stone Hilton PLLC also failed to reimburse Plaintiff expenses of $4,562.02. Plaintiff submitted to Stone Hilton PLLC the spreadsheets attached by reference as Exhibit 2 and hereby incorporated by reference. These spreadsheets identify Plaintiff's unreimbursed expenses. Plaintiff previously submitted these spreadsheets outlining her expenses to Stone Hilton PLLC, with

8

receipts substantiating those expenses. Stone Hilton PLLC promised to reimburse Plaintiff for these expenses; however, to date, the expenses remain unpaid by Stone Hilton PLLC.

37. In October of 2023, after Texas Attorney General Paxton's impeachment trial had concluded, Plaintiff, Judd Stone, Christopher Hilton, Amy Hilton, Joe Mazzara, and Kateland (Katie) Jackson returned to the AG's office for employment. Judd Stone returned to the AG's Office as the Solicitor General. Christopher Hilton returned to the AG's Office as the Chief of the General Litigation Division.

38. Once back at the AG's Office, both Amy Hilton and Plaintiff reported Judd Stone's and Christopher Hilton's treatment of them at Stone Hilton PLLC to Brent Webster, first assistant to Texas Attorney General Paxton. (Like Plaintiff, Webster is Caucasian.) Webster confronted Judd Stone and Christopher Hilton about Amy Hilton's and Plaintiff's allegations, and Stone promptly admitted that all of the allegations were true and that the actions described by Amy Hilton and Plaintiff did indeed happen, and Christopher Hilton did not contest the allegations made by Amy Hilton and Plaintiff.

39. Webster therefore recommended to Attorney General Paxton that Judd Stone's and Christopher Hilton's employment by the AG's Office be terminated, and Attorney General Paxton agreed.

40. Webster also instructed Amy Hilton and Plaintiff to report Judd Stone's and Christopher Hilton's treatment of them at Stone Hilton PLLC to Grant Dorfman, former deputy first assistant to the Texas Attorney General, who now serves as a judge appointed by Texas Governor Greg Abbott, which they did.

41. When Judge Dorfman met with Solicitor General Stone and Chief of the General Litigation Division Hilton and confronted them about the allegations made against them by Amy Hilton and

Plaintiff, Stone admitted to Judge Dorfman that the allegations made by Amy Hilton and Plaintiff against him and Chief of the General Litigation Division Christopher Hilton were true and stated that it was "okay" because it was during their time at a private law firm, and Christopher Hilton did not contest the allegations made by Amy Hilton and Plaintiff.

42. The AG's Office instructed Judge Dorfman to carry out the termination process. Judge Dorfman informed Stone and Christopher Hilton that if they did not resign, they would be terminated.

43. On October 17, 2023, at the end of their conversation with Judge Dorfman, Stone and Christopher Hilton submitted their resignations from the AG's Office. *See* Hilton resignation letter, attached and incorporated by reference as Exhibit 3; *see* Stone resignation text, attached and incorporated by reference as Exhibit 4. These resignation letters were obtained by Plaintiff from the AG's office via a Public Information Act request.

44. Upon information and belief, Judd Stone had previously been asked to resign from his position working for U.S. Senator Ted Cruz due to allegations of sexual harassment against him, including that Judd Stone had sexually harassed female interns who worked for Senator Cruz.

45. Judd Stone and Christopher Hilton now practice law with Stone Hilton PLLC.

46. Plaintiff filed a sexual harassment charge at the Texas Workforce Commission (TWC) against Defendants. In response to Plaintiff's TWC Charge against Defendants, Defendants admitted that some of the conduct alleged above is true, including the comment, "I highly doubt that is the most disgusting thing that has ever been in your mouth." Defendants claimed to the TWC that the conduct alleged above, including the admitted comment, "I highly doubt that is the most disgusting thing that has ever been in your mouth," was not sexual in nature.

47. Stone Hilton PLLC claimed to the TWC that Plaintiff is in possession of "substantial valuable property" of the firm, including furniture, a laptop, a phone, and access to various firm accounts.

48. Plaintiff is not in possession of any furniture, laptop, or phone belonging to Stone Hilton PLLC. Nor does she have access to Stone Hilton PLLC accounts.

49. During the impeachment trial, Stone stated he was going to "put all the phones in a blender when the trial was over and dump them in a river."

50. Prior to the impeachment trial, Stone Hilton PLLC, Judd Stone, and Christopher Hilton instructed the employees of Stone Hilton PLLC, including Plaintiff, to order custom desk chairs for themselves. (Upon information and belief, like the business suits, Botox treatments, and hair salon treatments, Stone Hilton PLLC sought and received reimbursement from its client, AG Paxton, for these chairs.) Stone Hilton PLLC, Judd Stone, and Christopher Hilton told the employees of Stone Hilton PLLC that the chairs were a gift they could all keep and "if we all go back to the OAG, we will all have badass chairs."

51. After learning from the TWC determination (Exh. 7, which is attached and incorporated by reference) that Stone Hilton PLLC has claimed Plaintiff is in possession of "substantial valuable property" of the firm, including furniture, Plaintiff returned the chair, which she had been using at her desk at the AG's Office with Defendants' permission, to Stone Hilton PLLC via its lawyers.

52. Plaintiff has received a right-to-sue letter from the TWC.

53. The TWC determined that Stone Hilton PLLC violated the Texas Labor Code by sexually harassing Plaintiff. Exh. 7. The TWC determination includes the following findings and analysis:

> To prevail on a sexual harassment claim based on a hostile work environment, the Charging Party must show the following prima facie elements: (1) Charging Party was an employee who belongs to a protected group; (2) Charging Party was

subjected to unwelcome harassment; (3) the harassment was based on sex; (4) the harassment affected a term, condition or privilege of employment.

If the harassment is conducted by a supervisor/manager, the Responding Party is automatically liable if the harassment resulted in a tangible employment action. If it did not, Responding Party is still liable unless it proves that it took reasonable care to prevent and correct the harassment promptly and that the Charging Party unreasonably failed to take advantage of any preventive or corrective opportunities provided by the Responding Party.

Element one is met because of Eskew's sex (female).

Element two is met because on June 16, 2023, Eskew, Stone, Christopher Hilton and Jackson went to lunch at Mort Subite Belgian Beer Bar in Austin. Stone and Christopher Hilton ordered four shots, one for each person at the table without Eskew's consent. Eskew stated that Stone and Hilton asked her to take a shot. After taking one sip, Eskew stated, "That is the most disgusting thing I have ever tasted," to which Stone replied, "I highly doubt that is the most disgusting thing that has ever been in your mouth." Eskew stated that Christopher Hilton laughed at Stone's sexually harassing comment.

The Responding Party made an implicit admission in its position statement that sexual comment at the bar was made, although Responding Party denied the sexual nature of the comments, stating that Stone's comment was not explicitly or implicitly sexual in nature.

There is corroborating evidence that Stone made the sexual comment at the bar to Eskew in addition to an explicit and violent story recounted by the other female employee who met with OAG leadership. In the email dated December 2, 2024, OAG leadership recounts the findings of the OAG's internal investigation and determined (for the OAG investigation purposes) that Eskew referred to the sexual comment made by Stone in October 2023, i.e., prior to her TWCCRD complaint. According to that internal investigation, Stone admitted that the allegations were true. Evidence shows that Stone did make the comment, and that Christopher Hilton was present when it was made. Eskew was interviewed by TWCCRD on March 12, 2025. The TWCCRD asked specifically during her interview what she perceived the sexual comment to mean. Her response was "oral sex." As such, Eskew's testimony shows that she perceived the comment to be sexual in nature. Although Responding Party denied the sexual nature of the comment, the decisive factor is whether a reasonable person, and the Charging Party herself, would find the comment to be sexual in nature and thus hostile, abusive, or offensive. Corroborating information presented and Eskew's testimony shows that a reasonable person would find the comment to be sexual in nature.

There are several additional factual allegations uncovered during the OAG's internal investigation that corroborate Stone "is willing to sexually and physically intimidate women that work for him."

Eskew was subjected to statements of sexual harassment and hostile workplace commentary that included, but was not limited to, the sexual comment made at the bar on June 16, 2023, which she perceived, and a reasonable person would perceive to be of a sexual nature. Stone further called Eskew "white trash" and stated that slurs were permissible at work. Corroborating evidence from an OAG email describes that when Judd Stone was confronted with the allegations against him, he admitted that all the allegations were true and that the actions described by the two females did indeed happen.

Element three is met because the evidence gathered and assessed through this TWCCRD investigation[] and corroborated by the OAG email describing the same events and information, reveals that Stone displayed a consistent pattern of harassment and sexual harassment toward females. The evidence does not show that Stone directed sexual or harassing commentary toward males. It is also noteworthy that Responding Party assigned only female employees to work on the ground floor of the office, with males working on a higher floor.

Element four is met because the harassment affected a term, condition or privilege of employment. Stone's acknowledged severe and pervasive harassment of Eskew, along with Christopher's Hilton's tacit approval, created a hostile work environment unreasonably interfering with her work performance with Responding Party and creating difficulties with her subsequent continued employment with the OAG. A hostile work environment exists when a workplace is permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment. Harassment is severe and pervasive when a reasonable person would find it hostile or abusive and when the victim subjectively perceived the harassment as abusive. *Wallace v. Performance Contractors*, No. 21-30482 (5th Cir. 2023).

The total amount of harassment alleged affected a term, condition or privilege of Eskew's employment because employees are afforded the right to work in an environment free of discriminatory intimidation, ridicule and insult. The language of Title VII is not limited to economic or tangible discrimination. The phrase "terms, conditions or privilege of employment" evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment. There is nothing in the Act to suggest that Congress contemplated the limitation to economic or tangible discrimination. *Meritor Savings Bank v. Vinson*, 477 U.S. 57 (1986).

Responding Party is liable for the harassment conducted by Stone and Christopher Hilton, who acted in the capacity of supervisors/managers through their assignment

of tasks to Eskew and control of her work environment, because the evidence indicates that Responding Party did not take reasonable care to prevent and correct the harassment promptly. An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998). Responding Party failed to take reasonable care through such actions as not promulgating and disseminating an antiharassment policy and establishing a complaint mechanism. There is insufficient evidence showing that Responding Party provided any anti-discrimination or anti-harassment training to employees. Eskew could not effectively file a complaint with Responding Party when there was no reporting mechanism in place and the harassers were the owners of the firm. Responding Party did not take reasonable care to prevent and correct the harassment promptly; therefore, there is a lack of proof of an affirmative defense. As a result, a prima facie case of sexual harassment has been established.

## VI.    Conclusion

Responding Party provided a position statement in response to this complaint on June 28, 2024. Responding Party was subsequently offered the opportunity to provide information by scheduling interviews with the investigator, but the Responding Party declined to do so.

Based upon the evidence described above, TWCCRD has determined that there is reasonable cause to believe that Responding Party subjected the Charging Party, Jordan Eskew, to sexual harassment in violation of Texas Labor Code, Chapter 21.

    . . . .

Sincerely,


Edward Serna
Executive Director
Texas Workforce Commission

Exh. 7.

54. Upon information and belief, Amy Hilton, Joe Mazzara, Allison Collins, and Kateland (Katie) Jackson have entered into settlement agreements with Defendants, pursuant to which each received money in exchange for promising not to disparage Defendants, among other promises. Upon information and belief, Amy Hilton, Joe Mazzara, Allison Collins, and Kateland (Katie)

Jackson agreed in their settlement agreements to the following statement or a statement substantially similar to the following:

> We are proud of our work together at Stone Hilton when we successfully defended Attorney General Ken Paxton in his impeachment trial. The four months we spent together were some of the most intense of our legal careers, and we were each impressed by the ability, integrity, and professionalism of our colleagues. While we have parted ways professionally, we did so amiably, and hold each other in nothing but the highest regard. We wish one another the best at the Office of the Texas Attorney General and Stone Hilton, respectively.

The settlement agreements did not prohibit, nor would it be lawful for the settlement agreements to attempt to prohibit, Amy Hilton, Joe Mazzara, Allison Collins, and Kateland (Katie) Jackson from providing truthful testimony in any legal proceeding, including this one.

55. Prior to Plaintiff's filing of this lawsuit, Defendants asked Plaintiff to agree that:

> We are proud of our work together at Stone Hilton when we successfully defended Attorney General Ken Paxton in his impeachment trial. The four months we spent together were some of the most intense of our legal careers, and we were each impressed by the ability, integrity, and professionalism of our colleagues. While we have parted ways professionally, we did so amiably, and hold each other in nothing but the highest regard. We wish one another the best at the Office of the Texas Attorney General and Stone Hilton, respectively.

She refused.

### Intentional Infliction of Emotional Distress against All Defendants

56. Plaintiff incorporates the foregoing paragraphs by reference.

57. Defendants intentionally or recklessly engaged in extreme and outrageous non-sexual conduct that caused Plaintiff severe emotional distress. As a result of Defendants' actions, Plaintiff has suffered, and will continue to suffer, severe emotional distress.

58. Because Defendants acted with malice and/or gross negligence, Plaintiff is entitled to punitive damages.

<u>**Violations of the Fair Labor Standards Act against All Defendants**</u>

59. Plaintiff incorporates the foregoing paragraphs by reference.

60. Stone Hilton PLLC is an employer as defined by 29 U.S.C. § 203(d).

61. Stone Hilton PLLC has employees subject to the provisions of 29 U.S.C. § 206 in the facility where Plaintiff was employed.

62. At all times material to this complaint, Stone Hilton PLLC employed two or more employees and had an annual dollar volume of sales or business done of at least $500,000.

63. At all times material hereto, Defendants Judd Stone and Christopher Hilton actively ran the business of Stone Hilton PLLC on a day-to-day basis; acted directly or indirectly in the interest of Stone Hilton PLLC in relation to Plaintiff's employment; and were substantially in control of the terms and conditions of Plaintiff's work.

64. Defendants Judd Stone and Christopher Hilton had the ability to hire and fire employees, supervised or controlled employees' work schedules and conditions of employment, and determined the rate and method of payment of wages to employees. Defendants Judd Stone and Christopher Hilton were Plaintiff's employer as defined by 29 U.S.C. § 203(d).

65. Plaintiff worked for Defendants Stone Hilton PLLC, Judd Stone, and Christopher Hilton as an executive assistant. She reported to Judd Stone and Christopher Hilton. Her duties included: performing clerical and secretarial tasks as directed by Judd Stone and Christopher Hilton; attending meetings; taking and organizing meeting notes; placing and picking up lunch orders; keeping the refrigerator and snack cabinet stocked; seeking approval for payment of invoices from third parties and, upon approval, processing payment for those invoices; seeking approval for expenses submitted by Stone Hilton PLLC employees and, upon approval, communicating approval of those expenses; making deposits; saving and organizing documents electronically;

communicating with vendors; running errands; entering contact information electronically; responding to emails; assembling trial exhibits; opening and forwarding mail; and making dinner reservations.

66. As an assistant for Stone Hilton PLLC, Plaintiff's primary duty was not the performance of work directly related to the management or general business operations of Stone Hilton PLLC. Nor did Plaintiff exercise discretion or independent judgment with respect to matters of significance. Plaintiff did not have authority to commit Stone Hilton PLLC in matters that had significant financial impact. Plaintiff did not have authority to negotiate and bind Stone Hilton PLLC on significant matters. Plaintiff did not provide consultation or expert advice to management. Plaintiff was not involved in planning long- or short-term business objectives. Plaintiff did not investigate and resolve matters of significance on behalf of management. Plaintiff did not represent Stone Hilton PLLC in handling complaints, arbitrating disputes, or resolving grievances. Likewise, Plaintiff did not have the authority to formulate, affect, interpret, or implement management policies or operating practices. Rather, Plaintiff was required to apply existing policies and procedures. Plaintiff could not waive or deviate from established policies and procedures without prior approval.

67. Plaintiff was, at all times material hereto, individually engaged in interstate commerce, as her work was directly related to the movement of things (including information) across state lines. Plaintiff's regular and recurring work included the use of the Internet, telephone, a computer email system, and other channels of interstate commerce.

68. During one or more weeks of Plaintiff's employment by Stone Hilton PLLC, Judd Stone, and Christopher Hilton, Plaintiff worked in excess of forty (40) hours.

69. Throughout the employment of Plaintiff, Defendants Stone Hilton PLLC, Judd Stone, and Christopher Hilton repeatedly and willfully violated Sections 7 and 15 of the Fair Labor Standards Act by failing to compensate Plaintiff at a rate not less than one and one-half times her regular pay rate of pay for each hour worked in excess of 40 hours in a workweek.

70. As a result of Stone Hilton PLLC's, Judd Stone's, and Christopher Hilton's unlawful conduct, Plaintiff is entitled to actual and compensatory damages, including the amount of overtime wages that should have been paid but were not paid.

71. Stone Hilton PLLC, Judd Stone, and Christopher Hilton failed to act reasonably to comply with the FLSA, and as such, Plaintiff is entitled to an award of liquidated damages in an equal amount as the amount of unpaid wages deemed to be owed pursuant to 29 U.S.C. § 216(b).

72. Plaintiff is also entitled to an award of reasonable and necessary attorneys' fees, costs, expert fees, mediator fees, and out-of-pocket expenses incurred by bringing this action pursuant to 29 U.S.C. § 216(b) and Rule 54(d) of the Federal Rules of Civil Procedure.

73. Plaintiff has retained the law firm of Frost Domel PLLC to represent her in this action. Plaintiff has entered into a valid contract with Frost Domel PLLC and has appointed the undersigned counsel to be her sole agent, attorney-in-fact, and representative in this suit, exclusive of all other parties, including Plaintiff. To avoid tortious interference with Plaintiff's obligations to her attorneys in this suit, all communications concerning this suit must be made by Defendants' attorneys solely to and through the undersigned counsel. Plaintiff's contract with and representation by the undersigned attorney gives rise to a claim for reasonable and necessary attorneys' fees that Plaintiff is entitled to collect against Stone Hilton PLLC, Judd Stone, and Christopher Hilton pursuant to 29 U.S.C. § 216(b).

**Breach of Contract/Promissory Estoppel/Quantum Meruit against Stone Hilton PLLC**

74. Plaintiff incorporates the foregoing paragraphs by reference. Defendant Stone Hilton PLLC owes Plaintiff the difference between the monthly wages it promised her and the monthly wages it actually paid her, i.e., $5,000 a month in wages, not including any bonus or expense reimbursement, for four months, or $20,000 in wages. These wages were promised to Plaintiff by Stone Hilton PLLC and remain unpaid.

75. Stone Hilton PLLC also owes Plaintiff unreimbursed expenses of $4,562.02. Stone Hilton PLLC promised to reimburse Plaintiff for these expenses; however, to date, the expenses remain unpaid by Stone Hilton PLLC.

76. Stone Hilton PLLC made promises to Plaintiff—specifically, that it would pay Plaintiff an annual salary of $180,000 year and that it would reimburse Plaintiff's expenses; Plaintiff reasonably and substantially relied on the promises to her detriment; Plaintiff's reliance was foreseeable by Stone Hilton PLLC; and injustice can be avoided only by enforcing Stone Hilton PLLC's promises.

77. Plaintiff provided valuable services; the services were provided for Stone Hilton PLLC; Stone Hilton PLLC accepted the services; and Stone Hilton PLLC had reasonable notice that Plaintiff expected compensation for the services.

78. There is a valid, enforceable contract; Plaintiff is a proper party to bring suit for breach of contract; Plaintiff performed; Stone Hilton PLLC breached the contract, and Stone Hilton PLLC's breach caused Plaintiff injury.

79. All conditions precedent have been performed or have occurred.

80. As a result of Stone Hilton PLLC's failure to pay Plaintiff wages and reimburse expenses as it promised, Plaintiff has suffered actual damages. Plaintiff also seeks reasonable attorney fees and costs.

### Sexual Harassment under Texas Labor Code against All Defendants

81. Plaintiff incorporates the foregoing paragraphs by reference.

82. To prevail on a sexual harassment claim, Plaintiff must show the following prima facie elements: (1) she was an employee who belongs to a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment was based on sex; and (4) the harassment affected a term, condition or privilege of employment.

83. Element one is met because of Plaintiff's sex (female).

84. Element two is met because on June 16, 2023, Plaintiff, Stone, Christopher Hilton and Jackson went to lunch at Mort Subite Belgian Beer Bar in Austin. Stone and Christopher Hilton ordered four shots, one for each person at the table, without Plaintiff's consent. Stone and Hilton asked Plaintiff to take a shot. After taking one sip, Plaintiff stated, "That is the most disgusting thing I have ever tasted," to which Stone replied, "I highly doubt that is the most disgusting thing that has ever been in your mouth." Christopher Hilton winced and laughed uncomfortably at Stone's sexually harassing comment.

85. Stone Hilton PLLC admitted to the TWC that the sexual comment at the bar was made. Stone Hilton PLLC denied to the TWC the sexual nature of the comment, stating that Stone's comment was not explicitly or implicitly sexual in nature.

86. Stone admitted to the AG's Office that the sexual comment at the bar was made. In conversations with the AG's Office, Christopher Hilton did not contest that the sexual comment at the bar had been made. A reasonable person would find the comment to be sexual in nature and

thus hostile, abusive, or offensive. Plaintiff found the comment to be sexual in nature and hostile, abusive, and offensive.

87. Plaintiff was subjected to statements of sexual harassment—specifically, the sexual comment made at the bar on June 16, 2023, which she perceived, and a reasonable person would perceive, to be of a sexual nature. Corroborating evidence from an email of the AG's Office describes that when Judd Stone was confronted with the allegations against him, he admitted that all the allegations were true and that the actions described by the two females did indeed happen.

88. Element three is met because the evidence gathered and assessed through this TWC investigation and corroborated by the email of the AG's Office describing the same events and information reveals that Stone displayed a consistent pattern of sexual harassment toward females. The evidence does not show that Stone directed sexual or harassing commentary toward males. It is also noteworthy that Stone Hilton PLLC assigned only female employees to work on the ground floor of the office, with males working on a higher floor.

89. Element four is met because the harassment affected a term, condition or privilege of employment. Stone's acknowledged severe and pervasive harassment of Plaintiff, along with Christopher's Hilton's tacit approval, created a hostile work environment for Plaintiff at Stone Hilton PLLC. A hostile work environment exists when a workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment. Harassment is severe and pervasive when a reasonable person would find it hostile or abusive and when the victim subjectively perceived the harassment as abusive. *Wallace v. Performance Contractors*, No. 21-30482 (5th Cir. 2023).

90. The sexual harassment alleged affected a term, condition or privilege of Plaintiff's employment because employees are afforded the right to work in an environment free of discriminatory intimidation, ridicule, and insult. The language of Title VII is not limited to economic or tangible discrimination. The phrase "terms, conditions or privilege of employment" evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment. There is nothing in the Act to suggest that Congress contemplated the limitation to economic or tangible discrimination. *Meritor Savings Bank v. Vinson*, 477 U.S. 57 (1986).

91. Stone Hilton PLLC, Judd Stone, and Christopher Hilton are each liable for the sexual harassment conducted by Stone and Christopher Hilton, who acted in the capacity of supervisors/managers through their assignment of tasks to Plaintiff and control of her work environment, because Defendants did not take reasonable care to prevent and correct the harassment promptly. An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998). Stone Hilton PLLC failed to take reasonable care through such actions as not promulgating and disseminating an antiharassment policy and establishing a complaint mechanism. Stone Hilton PLLC failed to provide any anti-discrimination or anti-harassment training to employees. Plaintiff could not effectively file a complaint with Stone Hilton PLLC when there was no reporting mechanism in place and the harassers were the owners of the firm. Stone Hilton PLLC did not take reasonable care to prevent and correct the harassment promptly; therefore, there is a lack of proof of an affirmative defense. As a result, a prima facie case of sexual harassment has been established.

92. As a result of Defendants' actions, Plaintiff has suffered, and will continue to suffer, compensatory damages, including but not limited to emotional pain, suffering, inconvenience, and loss of enjoyment of life.

93. Because Defendants acted with malice and gross negligence and reckless indifference to Plaintiff's statutory right to be free from sexual harassment in her place of employment, Plaintiff is entitled to punitive damages.

94. Plaintiff also seeks reasonable attorney fees and costs.

**Hostile Work Environment Based on Race under 42 U.S.C. § 1981 against All Defendants**

95. Plaintiff incorporates the foregoing paragraphs by reference.

96. To prevail on a hostile work environment claim based on race under section 1981 of the Civil Rights Act of 1866, Plaintiff must show the following prima facie elements: (1) she was an employee who belongs to a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment was based on race; and (4) the harassment affected a term, condition or privilege of employment. 42. U.S.C. § 1981.

97. Element one is met because of Plaintiff's race (Caucasian).

98. Element two is met because around July 17, 2023, Plaintiff was subjected to unwelcome harassment—specifically, while working at the Stone Hilton PLLC office, Judd Stone told Plaintiff that she is "white trash" because she was wearing turquoise earrings. This comment occurred in front of Christopher Hilton, who did nothing to correct Stone or stop him.

99. As noted by the TWC: "'White trash' is a derogatory racial term used to refer to Caucasians of low economic means from rural areas; Plaintiff lives in Bastrop."  Exh. 7.

100.    A reasonable person would find the comment to be racial in nature and thus hostile, abusive, or offensive. Plaintiff found the comment to be racial in nature and hostile, abusive, and offensive.

101.    Plaintiff was subjected to statements of racial harassment—specifically, the "white trash" comments made on July 17, 2023, which she perceived, and a reasonable person would perceive, to be racial in nature. Corroborating evidence from an email of the AG's Office describes that when Judd Stone was confronted with the allegations against him, he admitted that all the allegations were true and that the actions described by the two females did indeed happen.

102.    Element four is met because the hostile work environment based on race affected a term, condition or privilege of employment. Stone's acknowledged severe and pervasive harassment of Plaintiff, along with Christopher's Hilton's tacit approval, created a hostile work environment for Plaintiff at Stone Hilton PLLC. A hostile work environment exists when a workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment. Harassment is severe and pervasive when a reasonable person would find it hostile or abusive and when the victim subjectively perceived the harassment as abusive.

103.    A single incident of harassment, if sufficiently severe, can be enough to establish a hostile work environment. Examples of severe incidents include the use of a racial slur directed at the employee.

104.    The hostile work environment based on race alleged affected a term, condition or privilege of Plaintiff's employment because employees are afforded the right to work in an environment free of discriminatory intimidation, ridicule, and insult.

105.    Stone Hilton PLLC, Judd Stone, and Christopher Hilton are each liable for the hostile work environment based on race created by Stone and Christopher Hilton, who acted in the capacity of supervisors/managers through their assignment of tasks to Plaintiff and control of her work environment, because Defendants did not take reasonable care to prevent and correct the hostile work environment promptly. An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. Stone Hilton PLLC failed to take reasonable care through such actions as not promulgating and disseminating an antiharassment policy and establishing a complaint mechanism. Stone Hilton PLLC failed to provide any anti-discrimination or anti-harassment training to employees. Plaintiff could not effectively file a complaint with Stone Hilton PLLC when there was no reporting mechanism in place and the harassers were the owners of the firm. Stone Hilton PLLC did not take reasonable care to prevent and correct the harassment promptly; therefore, there is a lack of proof of an affirmative defense. As a result, a prima facie case of hostile work environment based on race has been established.

106.    As a result of Defendants' actions, Plaintiff has suffered, and will continue to suffer, compensatory damages, including but not limited to emotional pain, suffering, inconvenience, and loss of enjoyment of life.

107.    Because Defendants acted with malice and gross negligence and reckless indifference to Plaintiff's statutory right to be free from a hostile work environment based on race in her place of employment, Plaintiff is entitled to punitive damages.

108.    Section 1981 of the Civil Rights Act of 1866 does not impose caps on compensatory or punitive damages.

109.    Plaintiff also seeks reasonable attorney fees and costs.

25

## **Jury Trial**

110.        Plaintiff demands a jury trial and has tendered the appropriate fee.

## **Request for Relief**

Plaintiff respectfully requests that Defendants be cited to appear and answer and that, on final trial, Plaintiff have judgment against Defendant(s) as follows:

1. Direct or general damages in an amount within the jurisdictional limits of the court;

2. Actual damages, including unpaid wages, unpaid expenses, and unpaid overtime;

3. Liquidated damages under the FLSA;

4. Past and future mental anguish damages, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses;

5. Expert fees;

6. Mediator fees;

7. Punitive damages;

8. Reasonable attorneys' fees;

9. Prejudgment interest as provided by law;

10. Postjudgment interest as provided by law

11. Court costs; and

12. Such other and further relief to which Plaintiff may be justly entitled.

Respectfully submitted,


FROST DOMEL PLLC
Emily Frost
State Bar No. 24036601
2499 S. Capital of Texas Hwy.
Suite B-203
Austin, Texas 78746
(512) 640-5501
emily@frostdomel.com

LOVINS LAW
Michael E. Lovins
State Bar No. 24032555
1301 S. Capital of Texas Hwy., A-136
Austin, Texas 78746
(512) 535-1649
michael@lovinslaw.com

By: _____
    Emily Frost

ATTORNEYS FOR PLAINTIFF

## <u>CERTIFICATE OF SERVICE</u>

       I certify that on September 19, 2025, a true and correct copy of the foregoing document was electronically filed on the CM/ECF system, which will automatically serve a Notice of Electronic Filing on the following:

Kimberly R. Miers
Texas Bar No. 24041482
kmiers@littler.com
Melinda J. Wetzel
Texas Bar No. 24115637
mwetzel@littler.com
LITTLER MENDELSON, P.C.
100 Congress Avenue, Suite 1400
Austin, Texas 78701
Telephone: 512.982.7250
Facsimile: 512.982.7248

**ATTORNEYS FOR DEFENDANTS**

 

_____
       Emily Frost

       ATTORNEYS FOR PLAINTIFF