UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| JORDAN ESKEW,<br>Plaintiff | §<br>§<br>§ | |
| v. | § | Case No. 1:25-cv-00804-ADA |
| STONE HILTON PLLC,<br>CHRISTOPHER HILTON, AND JUDD STONE,<br>Defendants. | §<br>§<br>§<br>§<br>§ | |

**APPENDIX TO PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR JUDGMENT**

Plaintiff submits this appendix to her response to Defendants' motion for summary judgment. Plaintiff incorporates all of the following into her response to Defendants' motion for summary judgment.

**List of Exhibits**

| | |
|---|---|
| Exhibit A | Declaration of Jordan Eskew |
| Exhibit 1(a) | Spreadsheets outlining Plaintiff's unreimbursed business expenses |
| Exhibit B | Excerpts of deposition of Jordan Eskew |
| Exhibit C | Communications between Plaintiff and Amy Hilton |
| Exhibit D | Excerpts of deposition of Hon. Grant Dorfman |
| Exhibit E | Excerpts of deposition of Judd Stone |
| Exhibit F | Excerpts of deposition of Paul Carmona |
| Exhibit G | Allison Collins texts |
| Exhibit H | Excerpts of deposition of Christopher Hilton |
| Exhibit I | Deposition of Amy Hilton |
| Exhibit J | Spreadsheet presented to employees of Stone Hilton PLLC |
| Exhibit K | Stone Hilton PLLC response to TWC |
| Exhibit L | Memo documenting complaint of harassment against Judd Stone |
| Exhibit M | Christopher Hilton email to the firm's accountant introducing Jordan |
| Exhibit N | Excerpts of deposition of Gayla Schwab |

## Statement of Facts

### A. Stone Hilton PLLC had no anti-harassment policy or training but affirmatively encouraged harassment.

1. Stone Hilton PLLC provided no anti-harassment training and had no written or oral policy prohibiting harassment—sexual or otherwise—or establishing any reporting mechanism. Exh. A, Declaration of Eskew; Doc. 29, para. 24; Doc. 30, para. 24. Instead, owner and supervisor Judd Stone told employees—including Plaintiff, witnessed by co-owner/supervisor Christopher Hilton and attorney Amy Hilton—"At this firm, there are no rules. You can say whatever slurs you want." Exh. A, Declaration of Eskew; Doc. 29, para. 21; Doc. 30, para. 21. Christopher Hilton witnessed this statement and sat idly by, taking no corrective action. Exh. A, Declaration of Eskew.

### B. On June 16, 2023, Judd Stone made an explicit sexual innuendo to Plaintiff.

2. At a work lunch on June 16, 2023, Christopher Hilton and Judd Stone ordered four alcoholic shots without Plaintiff's consent and pressured her to drink. Exh. A, Declaration of Eskew; Exh. B, Deposition of Eskew, pp. 104:3–8, 110:18–24, 203:21–24, 259:21–260:1, 267:22–269:1; Exh. C (communications between Plaintiff and Amy Hilton); Doc. 30, para. 20. After Plaintiff said the shot was "the most disgusting thing I have ever tasted," Judd Stone replied: "I highly doubt that is the most disgusting thing that has ever been in your mouth." Exh. A, Declaration of Eskew; Exh. B, Deposition of Eskew, pp. 104:3–8, 110:18–24, 203:21–24, 259:21–260:1, 267:22–269:1; Exh. C (communications between Plaintiff and Amy Hilton). This was an explicit sexual innuendo about Plaintiff engaging in oral sex, probably under disreputable and promiscuous circumstances. Plaintiff was immediately shocked, humiliated, and offended. Exh. A, Declaration of Eskew. She looked to Christopher Hilton for help, but he only winced and laughed uncomfortably. Exh. A, Declaration of Eskew; Exh. B, Deposition of Eskew, p. 111:5–6. No corrective action was taken. Exh. A, Declaration of Eskew.

**C. The comment was sexual in nature—confirmed by Defendants' admissions and neutral third parties.**

3. Plaintiff immediately perceived the comment as sexual, unwelcome, and based on her sex. Exh. A, Declaration of Eskew. She reported it internally and to the OAG. *Id.*; Exh. B, Deposition of Eskew, pp. 262:12–17; Exh. D, Deposition of Dorfman, pp. 75:3–7, 84:17–24, 85:13–17.

4. When Defendants returned to work for the OAG following the impeachment trial, Plaintiff reported her experiences—including the sexual harassment—to officials at the OAG. Unlike Defendants, the OAG took her complaint seriously. Exh. A, Declaration of Eskew. Hon. Grant Dorfman investigated the allegations. Following and based upon the findings of that investigation, Stone and Hilton were offered resignation in lieu of termination. Exh. D, Deposition of Dorfman, p. 159:9–13. Hon. Dorfman testified that Stone and Hilton were "forthright in acknowledging that these things were said or done," there was "very little, if any dispute as to what was said," "with Jordan, I don't think there's anything she said or has said in the complaint that [Stone] disagreed with," and the comment was "laden with sexual innuendo." Exh. D, Deposition of Dorfman, pp. 85:8–97:12, 89:8–11, 117:6–14, 122:21–23, 126:19–21, 136:7–15.

5. TWC investigator Paul Carmona confirmed the comment and investigated it as sexual. Exh. F, Deposition of Carmona, pp. 80:17–81:4, 117:4–10. OAG employee Gayla Schwab testified it was sexual in nature and understood why a subordinate would feel sexually harassed. Exh. N, Deposition of Schwab, pp. 47:1–3, 57:12–18, 65:5–7, 66:2–4.

6. In his deposition, Stone rephrased the comment but, when asked if he denied any sexual connotation, answered: "Not really." Exh. E, pp. 125:16–126:16, 128:2–5.

**D. The sexual harassment created an abusive working environment.**

7. As a direct result of the sexual comment, Plaintiff felt verbally abused, humiliated, degraded, and trapped in an unsafe environment with no recourse due to the firm's "no rules" policy. Exh. A, Declaration of Eskew. She became hypervigilant and had difficulty concentrating; she preferred running errands outside the firm to avoid Stone and Christopher Hilton. *Id.*

**E. Supervisors with full authority committed the conduct.**

8. Judd Stone made the comment; Christopher Hilton enabled it through laughter and inaction. *Id.* Both were managing members and owners of Defendant Stone Hilton with full authority over Plaintiff's employment. *Id.*

**F. Defendants' "welcoming" argument is unsupported.**

9. Defendants suggest Plaintiff "welcomed" harassment via a comment like, "What are you going to do, spank me?" The evidence shows that any such statement was not sexual in nature or intent, was not responsive to or accepting of sexual conduct, and Defendants never accused Plaintiff of making a sexual comment. *Id.* Their chastisement of Plaintiff never referenced any supposed sexual innuendo. *Id.* Instead, the chastisement was merely a reinforcement of the abusive power dynamic that Stone and Hilton enforced over Plaintiff. *Id.* Furthermore, Plaintiff's attempt to stand up for herself in the face of abusive bosses does not reasonably imply that she welcomed implicit accusations of promiscuity or accusatory references to her private sex life. *Id.* As discussed above, Plaintiff reported the comment as sexual harassment; neutral parties confirmed its sexual character.

**G. Pattern and practice evidence shows intent and toxic culture — corroborated by Amy Hilton's testimony.**

10. Defendants had a pattern and practice of making graphic sexual comments in professional settings and taunting or silencing female employees who objected. This evidence is offered to show

motive, intent, absence of mistake or accident, and the culture Defendants created—i.e., that Stone's lunch comment was intentionally sexual and consistent with how they treated female employees. It also shows Defendants' efforts to control the narrative through settlement agreements containing non-disparagement provisions. Exh. I, Deposition of Amy Hilton, throughout.

11. At a Federalist Society dinner, Judd Stone made graphic sexual comments about OAG employee Brent Webster being anally impaled and raped by a meteor in front of Amy Hilton (then an attorney at Stone Hilton) and several judges. Hon. Grant Dorfman (from approximately 40 feet away) told Stone to stop. Amy Hilton's eye-roll reaction indicated to Dorfman this was not the first time Stone and Hilton later taunted the upset female employee that she "couldn't handle talk about dicks." Exh. D, Deposition of Dorfman, pp. 197:1–19, 197:20–25, 198:1–5; *see also* Exh. A, Declaration of Eskew.

12. In her deposition, Amy Hilton stated that Stone's and Hilton's actions during the impeachment trial "were not always good." When asked what she meant by that, she refused to provide more information, citing concerns that truthful testimony could breach her settlement agreement with Stone Hilton PLLC containing non-disparagement provisions. Exh. I, Deposition of Amy Hilton, pp. 14:1–25; *see also* her counsel's instructions at pp. 4:20–5:25 and throughout. This testimony corroborates both the existence and seriousness of the pattern of sexualized conduct by Judd Stone and Christopher Hilton toward female attorneys at the firm, as well as Defendants' efforts to silence witnesses through settlement agreements.

13. Amy Hilton's refusal to provide full details about the summer events due to her settlement agreement with Stone Hilton supports an adverse inference against Defendants and demonstrates

the toxic, controlling environment they created—one in which female employees who experienced or witnessed sexual harassment felt pressured to stay silent.

**H. Defendants' sexual harassment caused an abusive work environment for Plaintiff.**

14. As a result of Defendants' sexual harassment, Plaintiff reasonably and subjectively experienced humiliation, felt trapped, became hypervigilant, and had difficulty concentrating and being present in the office. Exh. A, Declaration of Eskew.

**I. Plaintiff and Defendants had an oral agreement.**

15. Defendant Stone Hilton PLLC offered to pay Plaintiff the salary of $180,000 per year to act as an assistant for four months and told her that her business expenses would be reimbursed, and she accepted. Exhibit A, Declaration of Eskew. The duties were described to Plaintiff prior to the time Plaintiff left the OAG as "to go and help with whatever they needed." Exh. A, Declaration of Eskew; Exh. B, Deposition of Eskew, p. 21:17–18, 119:7–14 ("It was just, will you come help us and just take care of everybody?"). Later, after Stone Hilton PLLC had begun operations, in a meeting with the entire firm, Christopher Hilton put the spreadsheet attached as Exhibit J up on a large screen and told everyone at the firm, including Plaintiff, that this is what they were going to get paid through the impeachment trial, for four months. Exh. A, Declaration of Eskew. Plaintiff verbally agreed to this offer. *Id.*; Exh. B, Deposition of Eskew, pp. 31:1–4 ("And yeah, I felt—I felt obligated. I felt like I had a contract with these people for four months, and four months only, until the job was finished."); 31:17–25 (Plaintiff was told by Christopher Hilton and Stone that they were going to be away from the OAG for four months); 202:6–9 ("I thought I was under the agreement with them. I was going to be working for them for four months, and they were going to pay me a certain amount for those four months.").

**J. The bonus paid to Plaintiff was characterized by Defendants as a bonus and taxed as a bonus.**

16. As Amy Hilton testified, the bonuses paid to the employees of Stone Hilton PLLC were characterized by Stone Hilton PLLC as bonuses; they were taxed as bonuses; and they were not a reimbursement of expenses. Exh. I, Deposition of Amy Hilton, p. 83:6–11 ("And then we got a bonus at the end, which, of course, was nice. But then also meant that we were paying different, you know, taxes on that, as a bonus, as opposed to salary. And so it wasn't—actually, it was not a reimbursement."); *see also* Exh. A, Declaration of Eskew; Exh. B, Deposition of Jordan Eskew, pp. 238:5–6 ("I was told that was a bonus that everyone got after the trial."; 243:21–22 ("I was told specifically that, that was a bonus for trial . . . .").

**K. Plaintiff's job duties do not meet the administrative exemption.**

17. Plaintiff's "primary duty" was neither "the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers"; *nor* "the exercise of discretion and independent judgment with respect to matters of significance," both of which are required to meet the administrative exemption. 29 C.F.R. § 541.200(a)(2) & (3); Exh. A, Declaration of Eskew. Rather, her primary duty was acting as Defendants' assistant and doing whatever they asked her to do. Exh. A, Declaration of Eskew; Exh. B, Deposition of Eskew, p. 199:7–8 ("I basically just did anything they asked me to do."). As Amy Hilton testified, Plaintiff "served as an assistant type of role"—not a "legal assistant" or "paralegal"—and her duties included picking up and placing lunch orders; picking up food, beverages, office supplies, and beer and liquor for Defendants; keeping the refrigerator and cabinets stocked; going to Best Buy with Stone Hilton attorney Joe Mazzara to purchase laptops; running errands for the firm; responding to emails, printing exhibits for trial; picking up mail from the post office; and making dinner reservations. Exh. I, Deposition of Amy Hilton, pp. 113:15–

119:9, 126:19–25; *see also* Exh. K, Defendants' response to TWC Charge, p. 3 ("[Plaintiff] was hired as an administrative assistant."); (Plaintiff's job duties included "assisting the legal team in any way that they required").

18. Plaintiff did not perform *any* duties (much less her *primary duty*) directly related to "management," including but not limited to

> activities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

29 C.F.R. § 541.201(c); Exh. A, Declaration of Eskew; Exh. B, Deposition of Eskew, p. 199:7–8

19. Likewise, Plaintiff did not perform any duties (much less her *primary duty*) directly related to "general business operations" including but not limited to:

> work in functional areas such as tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations, government relations; computer network, internet and database administration; legal and regulatory compliance; and similar activities.

Exh, A, Declaration of Eskew. Plaintiff was not "managing" anything; she was simply following Defendants' instructions and carrying out their orders. Exh. A, Declaration of Eskew, Exh. B, Deposition of Eskew, p. 199:15–19 (Plaintiff did not set up the entire office). She did not select the office—rather, she followed Defendants' instructions to research options for potential office space and present those options to Defendants, a one-time clerical task. Exh. A, Declaration

of Eskew; Exh. B, Deposition of Eskew, p. 120:20–23 ("I—the property that they ended up choosing, I went and I met the Realtor and I took videos and pictures and stuff and took that back to Chris and Judd."). When asked for an opinion on which office space she liked, Plaintiff offered it, but that was not until after she had completed the one-time clerical task. Exh. A, Declaration of Eskew. It was Defendants who decided which office space they wanted. *Id.* She did not select the utilities provider—rather, she followed Defendants' instructions to set up Stone Hilton PLLC's utilities with the City of Austin, a one-time clerical task. *Id.* She followed Defendants' instructions to purchase iPhones and set the firm up with phone service, a one-time clerical task. *Id.* She did not select the vendors to be used for Internet services, legal research services, repair and maintenance services, trash removal services, or the marketing firm hired by Defendants, nor did she "supervise" or "manage" them; rather, she followed Defendants' instructions to research options for these potential vendors and present those options to Defendants, a one-time clerical task. *Id.* Defendants then decided which vendors they wanted. *Id.* For example, she set up the firm's Microsoft365 Account because Defendants directed her to, a one-time clerical task. *Id.* She set up the firm's Westlaw account because Defendants directed her to, a one-time clerical task. *Id.* She did not handle communications with the owner of the building regarding its plumbing or HVAC problems: "Judd and Chris, they handled that with the owner." Exh. B, Deposition of Eskew, p. 132:8–16; *see also* Exh. A, Declaration of Eskew. She did not select the insurance provider or insurance to be purchased—rather, she followed Defendants' instructions to research options for potential insurers and get quotes for the kind of insurance coverage Defendants told her they wanted, and communicated that information to Defendants, a one-time clerical task. Exh. A, Declaration of Eskew. Defendants decided which insurer to use and which coverage to buy. *Id.* She did not "handle" Stone Hilton PLLC's incorporation filings—rather, she tried to fill out the

forms required by the Secretary of State herself, as directed by Defendants, a one-time clerical task; then forwarded the forms to Defendants for revision and approval; and then delivered the forms to the Secretary of State's office. Exh. A, Declaration of Eskew. In fact, as Christopher Hilton testified, Defendants "had another attorney outside of the OAG help us with that process." Exh. H, p. 85: 13–14. Nor did she "manage expense-tracking"—rather, she gathered the lawyers' receipts to create expense reports and forwarded them to the accountant, a clerical task. Exh. A, Declaration of Eskew; Exh. B, Deposition of Eskew, p. 122:9–11 ("I would send the CPA any—you know—reimbursement sheets that people would send me and keep track of that and send that over to her every month."). Christopher Hilton sent an email to the firm's accountant introducing Jordan as "our admin who is going to help you wrangle us on … expenses." Exh. B, Deposition of Eskew, p. 125:12–13; Exh. M. She did not recommend what IT providers or what technology to use. Exh. A, Declaration of Eskew. She did not sign any service contracts without first receiving permission from Defendants. *Id.* She signed service contracts only if she was specifically instructed to do so by Defendants. *Id.* Defendants never sought her advice for tax or compliance purposes. *Id.* She did not participate in drafting profit and loss reports; nor would she have been qualified to, as she does not have any experience, education, or training in accounting, finance, or tax services. *Id.* Nor she perform paralegal tasks, as she was not a certified paralegal. *Id.*; *see also* Exh. I, Deposition of Amy Hilton, pp. 113:15–119:9, 126:19–25.

20. Likewise, Plaintiff did not perform any duties (much less perform as her *primary duty*) work directly related to the management or general business operations of the employer or the employer's customers, which work "include[ed] the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a)(2) & (3); Exh. A. Declaration of Jordan Eskew.

21. Contrary to Defendants' claims, Plaintiff did not compare and evaluate possible courses of conduct and act or make a decision after considering various possibilities. Exh. A, Declaration of Eskew. Nor did she have authority to formulate, affect, interpret, or implement management policies or operating practices; nor did she carry out major assignments in conducting the operations of the business; nor did she perform work that affected business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; nor did she have authority to commit the employer in matters that have significant financial impact; nor did she have employee authority to waive or deviate from established policies and procedures without prior approval; nor did she have authority to negotiate and bind Stone Hilton PLLC on significant matters; nor did she provide consultation or expert advice to management; nor was she involved in planning long- or short-term business objectives; nor did she investigate and resolve matters of significance on behalf of management; nor did she represent the company in handling complaints, arbitrating disputes or resolving grievances. 29 C.F.R. § 541.202(b); Exh. A, Declaration of Eskew; Exh. B, Deposition of Eskew, p. 199:7–8 ("I basically just did anything they asked me to do.").

22. Also contrary to Defendants' claims, Plaintiff did not independently evaluate office-space options—rather, she followed Defendants' instructions to research options for potential office space and presented them to Defendants, a one-time clerical task. Exh. A, Declaration of Eskew. She did not select vendors and service providers—rather, she followed Defendants' instructions to research options for these potential vendors and present those options to Defendants, a one-time clerical task. *Id.* Defendants then decided which vendors they wanted. *Id.* Nor did she coordinate repairs and maintenance; rather, she followed Defendants' instructions to call the repair or maintenance service Defendants had selected and acted as a messenger between Defendants and

the repair or maintenance service, a clerical task. *Id.* She did not approve any repair or maintenance service except as directed by Defendants. *Id.* Nor did she "work[] with the CPA on expense classification"—rather, she gathered the employees' expense reports and forwarded them to the CPA, a clerical task. *Id.* Defendants assert that Plaintiff "made procurement decisions," but she did not. *Id.* She followed Defendants' instructions to purchase furniture for the office, which furniture was chosen by Defendants. *Id.* Defendants also assert that Plaintiff advised them "on operational and technology matters," but she did not. *Id.* She did not recommend what IT providers or what technology to use. *Id.* She made an online order to Best Buy to purchase laptops because Defendants instructed her to. *Id.* She set up the firm with a Microsoft365 account and a Westlaw account because Defendants instructed her to. *Id.* Again, none of these are "matters of significance" as outlined by 29 C.F.R. § 541.2029(b), and in none of these matters did she act with discretion and independent judgment. Exh. A, Declaration of Eskew.

23. Defendants fail to mention Plaintiff's primary duties: performing clerical and secretarial tasks as directed by Stone and Christopher Hilton; attending meetings; taking and organizing meeting notes; placing and picking up lunch orders; keeping the refrigerator and snack cabinet stocked; seeking approval from Defendants for payment of invoices from third parties and, upon approval from Defendants, processing payment for those invoices; seeking approval from Defendants for expenses submitted by Stone Hilton PLLC employees and, upon approval by Defendants, communicating approval of those expenses to the employees; making deposits; saving and organizing documents electronically; running errands; entering contact information electronically; responding to emails; printing trial exhibits; opening and forwarding mail; and making dinner reservations. Exh. A, Declaration of Eskew; Exh. B, Deposition of Eskew ("I basically just did anything they asked me to do."); Exh. K, Defendants' response to TWC Charge,

p. 3 ("[Plaintiff] was hired as an administrative assistant."); (Plaintiff's job duties included "assisting the legal team in any way that they required"). She spent almost an entire Saturday (unsuccessfully) helping Stone look for his phone and calling AT&T at his demand. Exh. A. Declaration of Jordan Eskew. She did not exercise independent discretion or judgment with regard to any of these tasks; rather she followed Defendants' instructions, and they made the decisions. *Id.* As Amy Hilton testified, Plaintiff "served as an assistant type of role"—not a "legal assistant" or "paralegal"—and her duties included picking up and placing lunch orders; picking up food, beverages, office supplies, and beer and liquor for Defendants; keeping the refrigerator and cabinets stocked; going to Best Buy with Stone Hilton attorney Joe Mazzara to purchase laptops as directed by Defendants; running errands for the firm; responding to emails, printing exhibits for trial; picking up mail from the post office; and making dinner reservations. Exh. I, Deposition of Amy Hilton, pp. 113:15–119:9, 126:19–25.

**L. Plaintiff was not an exempt highly compensated employee.**

24. Plaintiff did not earn total annual compensation of at least $107,432 from Defendants as required by 29 C.F.R. § 541.601(a)(1). Exh. A, Declaration of Jordan Eskew. Defendants' failure to inform the Court that FLSA regulations provide that "If the employer fails to make such a payment, the employee does not qualify as a highly compensated employee . . . ." is telling. 29 C.F.R. § 541.601(b)(2). Nor did Plaintiff customarily and regularly perform any of the exempt duties or responsibilities of an administrative employee. Exh. A, Declaration of Eskew.

**M. Defendants valued Plaintiff's contributions.**

25. Plaintiff's services were accepted by Stone Hilton and enjoyed by it. In addition to the trial bonus described above, Stone Hilton PLLC told the TWC: "[Plaintiff's] work was satisfactory" and "In the event that Stone Hilton continued its operations following the impeachments

proceedings, [Plaintiff] was enthusiastically and repeatedly invited to remain with the Firm." Exh. K, p. 3.

**N. Defendants engaged in a pattern of abusive behavior toward Plaintiff (and other female employees).**

26. During Plaintiff's employment by Stone Hilton PLLC, Judd Stone, an owner of Stone Hilton PLLC and one of Plaintiff's supervisors, stated "In this firm, there are no rules. You can say whatever slurs you want." Exh A, Declaration of Eskew. This comment was witnessed by Christopher Hilton, also an owner of Stone Hilton PLLC and one of Plaintiff's supervisors, among others. *Id.* Christopher Hilton did nothing to stop Stone or correct him. *Id.* When confronted with this allegation by Hon. Dorfman, Stone admitted it and Christopher Hilton did not contest it. Exh. D, Deposition of Dorfman, pp. 187:20–188:15.

27. Stone, an owner of Stone Hilton PLLC and one of Plaintiff's supervisors, regularly drank alcohol throughout the workday (in Doc. 30, para 34, Defendants admit that on at least 2 occasions, Stone asked Plaintiff to make him a drink at the office) and regularly screamed at Plaintiff (and others) during the workday. Exh A, Declaration of Eskew; Exh. B, Deposition of Eskew, pp. 101:2–102:17 (Plaintiff complained to OAG employees Webster and Schwab about Stone screaming at her); 259:22 ("[H]e screamed at me . . . ."); 260:19–24 (Stone screamed at the female attorneys); 247:3–14 (Stone hung over the railing and screamed at the female attorneys); Exh. C (communications between Plaintiff and Amy Hilton dated July 27, 2023, wherein Plaintiff describes Stone's presence in the office as "literal hell"); Exh. C (communications between Plaintiff and Amy Hilton dated August 4, 2023, wherein Amy Hilton states "Was Judd like this on the 8th floor? Is he serious when he screams or is it a show?"). Christopher Hilton, also an owner of Stone Hilton PLLC and one of Plaintiff's supervisors, was aware of this and did nothing to stop Stone or correct him. Exh A, Declaration of Eskew; *see also* Exh. C (communications between

Plaintiff and Amy Hilton dated August 6, 2023, wherein Amy Hilton states: “Chris is beginning to see Judd as a management problem for sure.”).

28. Around July 28, 2023, at the office, Plaintiff sent Judd Stone, an owner of Stone Hilton PLLC and one of Plaintiff’s supervisors, his reimbursement spreadsheet for him to approve or make changes to before sending to the accountant. Exh A, Declaration of Eskew; Exh. B, Deposition of Eskew, pp. 101:2–102:17 (Plaintiff complained to OAG employees Webster and Schwab about Stone screaming at her); 245:17–246:6. In front of Stone Hilton PLLC employees Kateland (Katie) Jackson, Amy Hilton, and Allison Collins, Stone physically intimidated Plaintiff by hanging over her shoulder and screaming in her face that there was something missing. Exh A, Declaration of Eskew; Exh. B, Deposition of Eskew, p. 184:14–19 (Stone physically intimidated Plaintiff by “hanging over me and screaming in my face.”).

29. Around July 17, 2023, at the office, Stone, an owner of Stone Hilton PLLC and one of Plaintiff’s supervisors, called Plaintiff “white trash” because she was wearing turquoise earrings. Exh A, Declaration of Eskew; Exh. B, Deposition of Eskew, pp. 205:1–15; 260:6; 261:20–23; 272:24–25; Exh. D, Deposition of Dorfman, pp. 88:6–11; 91:16–20 (“I recall Judd Stone very clearly, very forthrightly, acknowledging, I think, maybe not every statement, but just about every statement. Certainly, the Jordan—the more salacious ones that Jordan made, Yep, that was me.”); 93:22–24 (“I don’t remember the earrings . . . I do remember the “white trash” comment.); 143:6–11 (Judd Stone “promptly admitted” the “white trash” comment). Once again, Christopher Hilton, also an owner of Stone Hilton PLLC and one of Plaintiff’s supervisors, was present for this and did nothing to stop Stone or correct him. Exh A, Declaration of Eskew; Exh. B, Deposition of Eskew, p. 205:1–15. Plaintiff complained to the others in the office about Stone calling her “white trash”; in response, they were “shocked and appalled.” Exh A, Declaration of Eskew; Exh. B,

Deposition of Eskew, p. 275:2–22; *see also* Exh. C (communications between Plaintiff and Amy Hilton dated August 6, 2023, wherein Amy Hilton states: "Chris is beginning to see Judd as a management problem for sure."). But no one took any action to stop Stone or correct him. Exhibit A, Declaration of Eskew.

30. Also, contrary to Defendants' contentions, Stone did not call the earrings "white trash." Doc. 30, para. 26. He called Plaintiff "white trash." Exh A, Declaration of Eskew; Exh. B, Deposition of Eskew, pp. pp. 205:1–15; 260:6; 261:20–23; 272:24–25; Exh. D, Deposition of Dorfman, pp. 93:22–24 ("I don't remember the earrings . . . I do remember the "white trash" comment.); 143:6–11 (Judd Stone "promptly admitted" the "white trash" comment).

31. On June 20, 2023, after Plaintiff picked up and delivered lunch to the office later than Defendants wanted, Stone, an owner of Stone Hilton PLLC and one of Plaintiff's supervisors, screamed at Plaintiff in front of Chris Hilton, also an owner of Stone Hilton PLLC and one of Plaintiff's supervisors, and other Stone Hilton PLLC employees Joe Mazzara, Kateland (Katie) Jackson, Amy Hilton, Allison Collins, and a third party named Ben Williams, that he was going to "punish" her. Exh A, Declaration of Eskew; Exh. B, Deposition of Eskew, pp. 101:2–102:17 (Plaintiff complained to OAG employees Webster and Schwab about Stone screaming at her); 277:2–5 ("[W]henever I was late with the barbecue and Judd was screaming that he was going to punish me . . . ."); *see also* Exh. C (communications between Plaintiff and Amy Hilton dated August 6, 2023, wherein Amy Hilton states: "Chris is beginning to see Judd as a management problem for sure."). In other words, Defendants deliberately humiliated Plaintiff in front of her co-workers and a third party. Stone admitted this incident to Hon. Dorfman but tried to justify it, saying: "So—so what if we were rude or abusive at our law firm?" Exh. D, Deposition of Dorfman, pp. 188:18–193:25; 143:6–11 (Stone "promptly admitted" the barbeque incident).

32. After returning to the office from a bar, Stone, an owner of Stone Hilton PLLC and one of Plaintiff's supervisors, and Christopher Hilton, also an owner of Stone Hilton PLLC and one of Plaintiff's supervisors, summoned Plaintiff to a separate room, and began to berate her in a hostile and abusive manner. Exh A, Declaration of Eskew; Exh. B, Deposition of Eskew, pp. 102:15–16; 106:16–108:8; 277:1–3. When they were finished, Christopher Hilton asked Plaintiff, "Do you think you can make yourself cry before you walk out? You know, to mess with everyone?" because Defendants "wanted to show everybody that they could make her cry." Exh. B, Deposition of Eskew, pp. 108:8–16; 109:1–5; *see also* Exh A, Declaration of Eskew. Stone admitted this incident to Hon. Dorfman but tried to defend it, saying: "So—so what if we were rude or abusive at our law firm?" Exh. D, p. 188:18–193:25; 143:6–11 (Judd Stone "promptly admitted" the barbeque incident). Hon. Dorfman further testified that he would not tolerate this kind of behavior in his office. *Id.* at 193:23–25; 194:10–12 ("[I]f the intent was to humiliate her, harass her, embarrass her, or make her coworkers think she was softer than she was, I would not tolerate that.").

33. In August 2023, at the office, Stone, an owner of Stone Hilton PLLC and one of Plaintiff's supervisors, asked Plaintiff to make him an alcoholic drink, a "Manhattan." Plaintiff did not know how to make a "Manhattan," so he gave her instructions. After she made the drink, he told her she needed to fill it higher, to which Plaintiff responded, "I promise you, it's full." Stone then told Plaintiff: "If anyone else makes a comment about my drinking, they'll be fired." This incident was witnessed by Christopher Hilton, an owner of Stone Hilton PLLC and one of Plaintiff's supervisors, who did nothing to stop Stone or correct him. Exh A, Declaration of Eskew; *see also* Exh. C (communications between Plaintiff and Amy Hilton dated August 6, 2023, wherein Amy Hilton states: "Chris is beginning to see Judd as a management problem for sure."). This incident was fully admitted by Defendants in their answer. Doc. 30, para. 33.

34. During the Paxton impeachment trial, Stone, a licensed attorney and officer of the court, sneezed into his hand and wiped the gob of mucous onto the back of the chair he was sitting in while in the Texas Capitol in front of Plaintiff, when there was a box of Kleenex right in front of him. Exh. A, Declaration of Eskew; Exh. B, Deposition of Eskew, pp. 45:14–23; 49:6–14.

35. Amy Hilton's refusal to answer questions about Defendants' conduct over the summer for fear of being sued by Defendants further warrants an inference that Defendants' conduct was extreme and outrageous. *See* Exh. I, throughout.

36. As a result of Defendants' conduct, Plaintiff felt verbally abused, publicly humiliated, and – because of the pro-harassment policy established by Defendants – trapped in an unsafe work environment. Exh. A, Declaration of Eskew; Exh. B, Deposition of Eskew, pp. 45:14–23, 61:21–24; 62:2–7; 258:18–21; 258:24–259:4; 259:21–260:9; 261:21–262:1; 271:14–17; 272:9–25. Plaintiff was forced to be hypervigilant, and it made it hard for her to concentrate at work, as she was constantly bracing for whatever harassment or abuse was coming next. Exh. A, Declaration of Eskew; Exh. B, Deposition of Eskew, p. 262:6–8. For this reason, she preferred (and looked for any reason) to run errands outside the firm, away from Stone and Christopher Hilton, in effect hiding from Defendants whenever possible. Exh. A, Declaration of Eskew. As Plaintiff stated on July 27, 2023, being in the office with Stone was "literal hell." Exh. C (communications between Plaintiff and Amy Hilton). (As discussed below, Defendants' actions caused another employee of Stone Hilton, Amy Hilton, to hide due to the humiliation she suffered due to Defendants' conduct.) To say that the way Plaintiff was treated by Defendants caused her severe disappointment and wounded pride is an understatement. Exh. A, Declaration of Eskew.

37. Defendants' pattern and practice of intentionally inflicting emotional distress on their employees is apparent from Christopher Hilton's text to Stone Hilton employee Allison Collins,

an employee of Stone Hilton under his supervision: "(The S is for suck my balls) I feel like we can Jew them [employees of Stone Hilton PLLC] out of health insurance and similar things." Exh. G (text between Allison Collins and Christopher Hilton dated June 7). This is typical of how Stone and Christopher Hilton treated employees of Stone Hilton PLLC. Exh. A, Declaration of Eskew.

38. Defendants' pattern and practice of intentionally inflicting emotional distress on their employees is also apparent from how they behaved in front of Amy Hilton, another employee under their supervision, at the Federalist Society dinner. Exh. D, Deposition of Dorfman, pp. 76:13–16 ("Amy had a lot of complaints about the – about her time at Stone Hilton during the impeachment trial. And concerns about working with Chris Hilton and Judd Stone back at the agency."); 76:22–25 ("There, certainly, were some, I think, complaints about the nature of how she and others were treated while there."); 80:10–13 (Amy Hilton's complaints "[v]ery possibly" had something to do with things that Judd or Chris may have said about Brent Webster.); 92:1–9 (Amy Hilton complained to Hon. Dorfman about Defendants' comments at the Federalist Society dinner as alleged in Plaintiff's complaint); 119:8–11 (Amy Hilton possibly expressed to Hon. Dorfman that she feared Judd Stone); 121:6–17 (Stone admitted to "some kind of meteor or satellite and that—it's not anal rape, but yeah, effectively the same . . . . It's certainly of a sexual nature of impacting upon Brent Webster's bodily orifice."); 136:24–137:19 (regarding the Federalist Society dinner, "Judd and Chris and—and Amy and a few others were there and hosted a very large table at the bar at the Four Seasons. And Judd was at the far end of the table, I was at the opposite end of the table, I think Amy Hilton was either seated next to me or perhaps one over for me. And I did hear—overhear Judd say something in a loud tone of voice about Brent Webster . . . . Something to the effect of a large spherical meteorite penetrating Brent Webster in much the same sense that the complaint alleges. And I—I don't recall, specifically, what I said or how I communicated it,

but I made it very clear that, I thought, I didn't care to hear any comments like that, and it wasn't appropriate."); 142:1 ("[F]rom my perspective, it was upsetting."); 143:6–7 ("Judd Stone promptly admitted just about everything that was relayed to me."); 149:4–6 (Stone "referred to himself on multiple occasions as an apex predator"); 150:20–22 (Stone brags about being "dangerous"); 150:25–151:2 (Stone says that "people shouldn't cross him. People shouldn't mess with him because they would live to regret it, or not live to regret it.") 154:17–19 ("But is he capable of aggression? Yeah, certainly. Verbal aggression, maybe more."); 147:20–22 ("[I]f what Jordan Eskew said was true, I—I certainly think she feels she was harassed and there was harassing behavior."); 196:2–6 (it was clear to Hon. Dorfman from Stone's remarks that he was expressing a fantasy about seeing Brent Webster be anally impaled by some sort of space object); 196:15–19 ("I made it clear that—I did not care for that. Didn't want to hear it. He needed to shut up. And then, just kind of like confined myself to a conversation with Amy and I'm sure I left earlier than I might otherwise have just because the unpleasantness of that."); 197:4–5 (Amy Hilton indicated to Hon. Dorfman that "this is not the first time he–she had heard this out of Judd . . . ."); 198:1–5 (Amy Hilton was possibly taunted for not being able to handle "talk about dicks"). As Amy Hilton stated to Allison Collins:

> At the judges' dinner thing last night, Chris and Judd were talking about a meteoric rod going up Brent's ass for at least 30 minutes . . . . In front of Kacsmark, Tipton, Blaylock, someone else, James Sullivan, Cruz counsel. . . . . I am so mortified . . . . I am so mortified I literally don't want to leave my hotel room. . . . I literally just . . . . I can't go downstairs . . . . It was soooooooooo excruciatingly bad . . . . OMG it was so bad/My stomach is turning just reliving it/Judd yelled at Libby [his fiancé]/Then quietly apologized. She definitely had tears in her eyes/It was bad. She was talking and he said "STOP STOP STOP STOP STOP!!!!" So he could continue talking shit with Chris. . . . you should be SO glad you're not here/This is public humiliation/I'm literally looking for Grant [Dorfman] to go find a way out of this absolutely horrific conversation/I actually resent Judd like a lot. . . . He is so unprofessional, inappropriate, crass, rude, demeaning. . . . I just can't. . . . I got to my parents' house and literally started crying as I was telling them how freaking awful Chris and Judd were this weekend/It was SO bad Allison

Exh. G (texts between Amy Hilton and Allison Collins dated September 23, 2023).

39. Defendants' pattern and practice of intentionally inflicting emotional distress on their employees establishes their conduct toward Plaintiff was the result of motive and intent to inflict emotional distress upon Plaintiff and not due to a mistake or accident. FED. R. EVID. 404(b)(2).

40. As Paul Carmona, the TWC investigator, testified:

> Q: Have you ever said about any employee under your supervision that you want to "Jew them out of health insurance"?
>
> A. No.
>
> Q. Why not?
>
> A: I think all of those statements would be offensive and at the very least, offensive to employees whom I viewed as peers and friends and co-workers, and at the worse, would subject me to either a legal action by a person to whom I said that or possibly termination from employment.
>
> Q. And is it your opinion based on those – based on your experience and training, that those kinds of comments may cause a person's work environment to be hostile or abusive?
>
> A. Yes.
>
> Q. Can you understand why someone who was called white trash by her boss would feel harassed due to her race?
>
> A. Yes, race or economic status, I think, but yes.
>
> Q. Is there any circumstance in which you believe it's okay to call an employee under your supervision white trash?
>
> A. No.

Exh. F, Deposition of Carmona, pp. 138:19–140:2; Exh. D, Deposition of Dorfman, p. 192:13–14; Exh. L; Exh. E at 22:3–5. As Stone Hilton co-worker Amy Hilton stated, "It's like they just think promises of throwing money – without the actual money!! – means they can treat us however they want. . . . The more I think about it, the angrier I get." Exh. C (communications between Plaintiff

and Amy Hilton dated August 6, 2023). As Hon. Dorfman testified, "[I]f the intent was to humiliate her, harass her, embarrass her, or make her coworkers think she was softer than she was, I would not tolerate that." *See* Exh. D, Deposition of Dorfman, pp. 193:23–25; 194:10–12.

41. As a result of (1) Defendants attempting to create a lawless workplace where any type of conduct, no matter how inappropriate or abusive, was not only permitted but encouraged; (2) Stone calling Plaintiff "white trash" while Christopher Hilton stood idly by, doing nothing; (3) Stone insisting that Plaintiff take an alcoholic shot at a Company lunch after she already said no, she didn't take shots; (4) Stone screaming at Plaintiff at the office during work hours; (5) Stone physically intimidating Plaintiff at the office during work hours by hanging over her shoulder and screaming into her face, in front of her co-workers; (6) Stone yelling at Plaintiff in front of her co-workers and a third party that he was going to "punish" her; (7) after they came back from the bar, Stone and Christopher Hilton berating Plaintiff in an abusive manner; and (8) after he came back from the bar, Christopher Hilton asking Plaintiff if she could cry in front of her co-workers in order to humiliate Plaintiff; (9) Stone sneezing into his hand and wiping the gob of mucous onto a chair in the Texas Capitol in front of Plaintiff, when there was a box of Kleenex right in front of him; and (10) Stone threatening to fire Plaintiff if she made any comment about his drinking, Plaintiff felt abused, publicly humiliated, and—because of the pro-harassment policy established by Defendants—trapped in an unsafe work environment. Exh. A, Declaration of Eskew. Plaintiff was forced to be hypervigilant, and it made it hard for her to concentrate at work, as she was constantly bracing for whatever harassment or abuse was coming next. *Id.* For this reason, she preferred (and looked for any reason) to run errands outside the firm, away from Stone and Christopher Hilton, in effect hiding from Defendants whenever possible. *Id.* As Plaintiff stated on July 27, 2023, being in the office with Stone was "literal hell." Exh. C (communications between Plaintiff and Amy

Hilton). Plaintiff also complained to her boyfriend at the time: "I don't think I can do this. I don't know how I can last these four months." Exh. B, Deposition of Eskew, p. 263:14–16; Exh. A, Declaration of Eskew. The way Plaintiff was treated by Defendants caused her severe disappointment and wounded pride, which lasted the entire time she worked for Defendants and continues through this day. Exh. A, Declaration of Eskew.

Respectfully submitted,

FROST DOMEL PLLC
Emily Frost
State Bar No. 24036601
2499 S. Capital of Texas Hwy, Suite B-203
Austin, Texas 78746
(512) 640-5501
emily@frostdomel.com

By: ______________________
Emily Frost

ATTORNEYS FOR PLAINTIFF

**CERTIFICATE OF SERVICE**

I certify that on June 8, 2026, a true and correct copy of the foregoing document was served on the following by email:

Kimberly R. Miers
Texas Bar No. 24041482
kmiers@littler.com
Melinda J. Wetzel
Texas Bar No. 24115637
mwetzel@littler.com
LITTLER MENDELSON, P.C.
100 Congress Avenue, Suite 1400
Austin, Texas 78701
Telephone: 512.982.7250
Facsimile: 512.982.7248

**ATTORNEYS FOR DEFENDANTS**

EFrost

Emily Frost